IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

JOSHUA DANIEL BISHOP,        :
                                :
            Petitioner      :
                                :
     vs.                    :
                                :     CIVIL ACTION NO.: 5:08-CV-91 (HL)
STEPHEN UPTON, Warden,   :
                                :
            Respondent   :
_____:

## ORDER

JOSHUA DANIEL BISHOP (hereinafter "Petitioner" or "Bishop"), an inmate on

death row at the Georgia Diagnostic and Classification Prison in Jackson, Georgia,

petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For reasons

discussed below, this petition is denied.

## I. BACKGROUND

### A.  Facts

The Georgia Supreme Court set forth the historical facts concerning this case:

Morrison drove Bishop and Bishop's co-indictee, Mark Braxley, to a bar.
Bishop and Braxley decided to steal Morrison's car. The three left the bar
around 11:00 p.m. and drove to Braxley's trailer. Bishop reached into the
sleeping Morrison's pocket for the car keys, but Morrison awoke and sat up.
Bishop began to beat Morrison about the head and face with a blunt object.
When Morrison was unconscious, Bishop took the car keys. Eventually
realizing that Morrison was dead, Bishop and Braxley wrapped and then
loaded the body into the back seat of Morrison's car. They drove to a
dumpster which was located a short distance from Braxley's trailer. After
unsuccessfully attempting to toss Morrison's body into the dumpster, Bishop
and Braxley left the body on the ground where it was discovered several

1

hours later. They drove Morrison's car into the nearby woods, set it on fire, and then walked back to Braxley's trailer to dispose of evidence of their crimes. After his arrest, Bishop made a statement in which he admitted delivering the blows with a wooden rod until Morrison stopped breathing, and described how he and Braxley disposed of the body and burned the car. Bishop subsequently confessed that, some two weeks prior to the murder of Morrison, he participated in the murder of Ricky Lee Wills[1] and that he buried Wills' body in the woods near Braxley's trailer. After investigators recovered Wills' body, a grand jury indicted Bishop and Braxley for that murder as well. The trial court admitted evidence regarding Bishop's participation in Wills' murder in aggravation of punishment during the penalty phase of this trial for Morrison's murder.

*Bishop v. State*, 268 Ga. 286 (1997).

### B. Procedural History

On February 12, 1996, Petitioner was found guilty of malice murder and armed robbery. *Bishop*, 268 Ga. at 286. "[T]he jury returned a verdict imposing a death sentence, finding as aggravating circumstances, that Bishop had murdered Morrison in the course of committing the additional capital felony of armed robbery." *Id*.

Petitioner filed a motion for new trial on March 8, 1996. *Id*. at 286 n.1. The petition was denied on September 19, 1996. (Resp't Ex. 2, p. 578).

The Supreme Court of Georgia affirmed Petitioner's convictions and sentence of death on July 16, 1997. *Bishop*, 268 Ga. at 296. Petitioner filed a motion for reconsideration that was denied on July 30, 1997. (Resp't Ex. 31).

Petitioner filed a Petition for Writ of Certiorari in the United States Supreme Court and the Court denied the Petition on February 23, 1998. *Bishop v. Georgia*, 522 U.S. 1119

---

[1]The record shows that Ricky Lee Wills was also known as Ricky Lee Willis. (Resp't Ex. 20, p. 2354). The Georgia Supreme Court's decision referred to him as "Wills," while the state habeas court referred to him as "Willis." In fact, both names are used in various places throughout the lengthy record. In this Order, the Court uses the name "Ricky Lee Wills" or "Wills."

(1998). The Court denied Petitioner's motion for rehearing on April 20, 1998. (Resp't Ex. 32, 34, 36).

On August 31, 1998, Petitioner filed a habeas corpus action in the Butts County Superior Court that challenged his conviction and sentence. (Resp't Ex. 37). After Petitioner filed an amended petition and the court conducted an evidentiary hearing, the state habeas court denied relief on all claims on March 17, 2006. (Resp't Ex. 40, 48-85, 95).

Petitioner filed an Application for Certificate of Probable Cause to Appeal in the Supreme Court of Georgia. (Resp't Ex. 97). The Supreme Court of Georgia denied the application on October 9, 2007 and denied a motion for reconsideration on November 5, 2007. (Resp't Ex. 99, 101).

On March 28, 2008, Petitioner filed in this Court a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. (R. at 1)

Petitioner requested discovery (R. at 14) and the Court granted this motion in part, and denied it in part. (R. at 20). The parties subsequently briefed the issue of procedural default. (R. at 29-32). The Court entered an Order finding that it was precluded from reviewing Claims Two and Three in the Petition for Writ of Habeas Corpus by a Person in State Custody.

The parties have now briefed the merits of the remaining claims.[2]

---

[2]Petitioner initially submitted a brief consisting of 129 pages, and later filed a reply brief consisting of 40 pages. Petitioner states that his briefs focus on "particular claims," but that he "does not abandon any claims set forth in his Federal Petition for Habeas Corpus Relief." (Pet'r Nov. 6, 2009 Br., p. 5). This Court addresses

## II.  DISCUSSION

### A. Standard of review under 28 U.S.C. § 2254 (d)

Petitioner's federal habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  This Court is "'limited in [its] review of every issue decided in the state courts by a general framework of substantial deference'."  *Cummings v. Sec'y for the Dep't of Corr.*, 588 F.3d 1331, 1355 (11th Cir. 2009)(quoting *Parker v. Allen*, 565 F.3d 1258, 1267 (11th Cir. 2009)).  Under AEDPA, Congress prohibited district courts from granting habeas relief unless a state court's adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254 (d).

The United States Court of Appeals for the Eleventh Circuit recently explained the "contrary to" clause of 28 U.S.C. § 2254 (d)(1) as follows:

> A state court's decision is "contrary to" federal law if it "contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts–in short, it is a decision substantially different from the Supreme Court's relevant

---

in detail only those "particular claims" on which Petitioner focuses in his briefs.  In relation to the various unaddressed claims, the Court finds that Petitioner has not shown that the state courts' determinations regarding any of these claims resulted in decisions that were "contrary to, or involved an unreasonable application of, clearly established Federal law," or "resulted in . . . decision[s] that w[ere] based on any unreasonable determination[s] of the facts in light of the evidence presented."  28 U.S.C. § 2254(d).

precedent."
***Cummings***, 588 F.3d at 1355 (quoting ***Kimbrough v. Sec'y***, 565 F.3d 796, 799 (11th Cir. 2009)).

 Conversely, "[a] state court's decision that applies the law as determined by the Supreme Court to the facts is not 'contrary to' whether or not the federal court would have reached a different result." ***Carr v. Schofield***, 364 F.3d 1246, 1250 (11th Cir. 2004)(citing ***Fugate v. Head***, 261 F.3d 1206, 1216 (11th Cir. 2001)). Moreover, in situations in which there is no Supreme Court precedent[3] on point, the federal court "'cannot say that the state court's conclusion . . . is contrary to clearly established federal law as determined by the United States'." ***Henderson v. Haley***, 353 F.3d 880, 890 (11th Cir. 2003)(quoting ***Isaacs v. Head***, 300 F.3d 1232, 1252 (11th Cir. 2002)).

The "unreasonable application" clause of 28 U.S.C. § 2254 (d)(1) has been explained as follows:

> A state court's decision involves an "unreasonable application" of federal law if it "identifies the correct governing legal principle as articulated by the United States Supreme Court, but unreasonably applies that principle to the facts of the petitioner's case, unreasonably extends the principle to a new context where it should not apply, or unreasonably refuses to extend it to a new context where it should apply."

***Cummings***, 588 F.3d at 1355 (quoting ***Kimbrough***, 565 F.3d at 799.)

The issue is not whether the state court applied federal law incorrectly; "relief is appropriate only if that application is objectively unreasonable." ***Michael v. Crosby***, 430 F.3d

---

[3]The "clearly established Federal law," involved in both the "contrary to" and "unreasonable application of" analyses, is "the 'holdings, as opposed to dicta, of the [United States Supreme] Court's decisions as of the time of the relevant state-court decision'." ***Newland v. Hall***, 527 F.3d 1162, 1183 (11th Cir. 2008) (quoting ***Williams v. Taylor***, 529 U.S. 362,412-13 (2000)). Moreover, "[c]learly established federal law is *not* the case law of the lower federal courts." ***Grossman v. McDonough***, 466 F.3d 1325, 1335-36 (11th Cir. 2006).

1310, 1319 (11th Cir. 2005). When attempting to determine if the state court's decision involved an unreasonable application of federal law, the federal district court need not decide if it "would have reached the same result as the state court if [it] had been deciding the issue in the first instance." *Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1256 (11th Cir. 2002). Instead, the court merely "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000).

In addition to the "contrary to" and "unreasonable application of" prongs of AEDPA, § 2254 (d)(2) provides that a petitioner is also entitled to relief if the state court's conclusion is based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d)(2). "'[A] determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner has] the burden of rebutting the presumption of correctness by clear and convincing evidence'." *Williams v. Allen*, No. 08-11905, 2010 U.S. App. LEXIS 4545, at *17 (11th Cir. March 4, 2010) (quoting 28 U.S.C. § 2254 (e) (1)). Finally, this Court must give deference to the state court's determinations regarding credibility. *Baldwin v. Johnson*, 152 F.3d 1304, 1317 (11th Cir. 1998).

**B. Claim One: Petitioner was deprived of his right to the effective assistance of counsel at trial and on appeal, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, *Strickland v. Washington*, 466 U.S. 668 (1984), and related precedent.**

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court

established what "remains the standard for evaluating ineffective assistance claims." *Blankenship v. Hall*, 542 F.3d 1253, 1271 (11th Cir. 2008), *petition for cert. filed* (U.S. Apr. 20, 2009)(No. 08-9917). An ineffective assistance of counsel claim consists of two elements: Performance and prejudice. "It is well established that a habeas petitioner must demonstrate both deficient performance and prejudice, and that a failure with respect to either prong constitutes a failure to demonstrate ineffective assistance of counsel." *Bottoson v. Moore*, 234 F.3d 526 (11th Cir. 2000). Moreover, "'there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one'." *Randolph v. McNeil*, 590 F.3d 1273, 1276 (11th Cir. 2009)(quoting *Strickland*, 466 U.S. at 697).

In relation to the performance component, courts have explained that "the petitioner must show that counsel's performance was deficient in that he 'made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment'." *Blankenship*, 542 F.3d at 1272 (quoting *Strickland*, 466 U.S. at 687). The Eleventh Circuit Court of Appeals explained the performance analysis as follows:

> The petitioner satisfies the test's performance prong by proving that counsel's performance failed to meet the standard of "reasonableness under prevailing professional norms." Our evaluation of counsel's performance is highly deferential; we must "indulge a strong presumption" that counsel's performance was reasonable and that counsel "made all significant decisions in the exercise of reasonable professional judgment." We review counsel's performance "from counsel's perspective at the time," to avoid "the distorting effects of hindsight." Our review is objective, in that we consider whether there was any reasonable justification for the attorney's conduct.

Thus, the "petitioner must establish that no competent counsel would have taken the action that his counsel did take."

*Newland v Hall,* 527 F.3d 1162, 1184 (11th Cir. 2008) (citations omitted).

If a petitioner shows that his counsel's performance was deficient, he still must show prejudice. To establish prejudice, Petitioner must show "that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different'." *Smith v. Spisak*, 130 S. Ct. 676, 685 (2010)(quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome'." *Newland*, 527 F.3d at 1184 (quoting *Strickland*, 466 U.S. at 694). "The prejudice prong does not focus only on the outcome; rather to establish prejudice, the petitioner must show that counsel's deficient performance rendered the results of the trial fundamentally unfair or unreliable." *Rhode v. Hall*, 582 F.3d 1273 (11th Cir. 2009)(citing *Lockhart v. Fretwell*, 506 U.S. 364 (1993)).

In this case, Petitioner contends that, but for his counsels' errors, he would not have received a sentence of death. In such a situation, the Court must "consider 'whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Newland*, 527 F.3d at 1184 (quoting *Strickland*, 466 U.S. at 695). In *Wong v. Belmontes*, 130 S. Ct. 383 (2009), the United States Supreme Court explained that when determining if prejudice exists, "it is necessary to consider all the relevant evidence that the jury would have had

before it if [Petitioner's counsel] had pursed a different path – not just the mitigation evidence [Petitioner's counsel] could have presented, but also the [aggravating evidence] that almost certainly would have come in with it." *Wong*, 130 S. Ct. at 386 .

Finally, the Court must keep in mind the additional layer of deference that AEDPA requires. A petitioner "must do more than satisfy the *Strickland* standard. He must show that in rejecting his ineffective assistance of counsel claim the state court 'applied *Strickland* to the facts of his case in an objectively unreasonable manner'." *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004)(quoting *Bell v. Stone*, 535 U.S. 685, 699 (2002)).

When a habeas petitioner claims that "'his trial counsel should have done something more, we first look at what the lawyer did in fact'." *Williams v. Allen*, No. 08-11905, 2010 U.S. App. LEXIS 4545 at *33 (11th Cir. March 4, 2010) (quoting *Grayson v. Thompson*, 257 F.3d 1194, 1218-19 (11th Cir. 2001)). A review of the record in this case shows that trial counsel[4] conducted an extensive investigation into Petitioner's past. They spoke with Petitioner, his family members, and friends on numerous occasions. (Resp't Ex. 48, p. 129, 143, 155, 197, 200, 205).

---

[4]Brian Combs and Reginald Bellury represented Petitioner at trial and on direct appeal. Mr. Combs was primarily a civil litigator who had handled only two criminal trials in the past and had no experience with handling murder trials. However, Reginald Bellury had handled numerous criminal trials, including at least ten (10) murder trials, and five (5) death penalty cases prior to his appointment in this case. Four of his previous death penalty cases went to trial, one of which ended in a mistrial and had to be tried again, and the fifth death penalty case ended in a plea. Mr. Combs explained that they were assisted by the Southern Center for Human Rights. (Resp't Ex. 48, p. 88-89, 120, 138, 142, 145).

Moreover, they hired a mitigation specialist–Jordan Miles Dayan–who was recommended by the Southern Center for Human Rights. (Resp't Ex. 48, p. 144, 220). Mr. Dayan met with Petitioner on many occasions, located and interviewed witnesses, spoke with many family members, and researched Petitioner's social history. (Resp't Ex. 48, p. 220). Mr. Dayan also interviewed numerous employees of the Department of Family and Children Services ("DFACS"), Petitioner's many former foster parents, and jail personnel. (Resp't Ex. 48, p. 233-34). Additionally, he obtained the DFACS records for Petitioner's entire family. (Resp't Ex. 48, p. 241).

Trial counsel and Mr. Dayan also researched and obtained arrest and conviction records for all witnesses and investigated the background of Petitioner's co-defendant, Mark Braxley. (Resp't Ex. 48, p. 107, 239).

Trial counsel first hired a psychologist, Alan Williams, who performed various psychological tests on Petitioner. (Resp't Ex. 48, p. 185).[5] Following this testing, counsel determined that they needed a psychiatrist and they hired Dr. Thomas Brown. (Resp't Ex. 48, p. 185). The attorneys also hired a jury expert, Patricia Maykuth with the Research Design Associates, who assisted in selecting a jury. (Resp't Ex. 48, p. 177).

Counsel explained that they quickly realized this was going to be a "penalty phase type case." (Resp't Ex. 48, p. 143). Mr. Combs explained as follows:

_____

[5]The record shows that the trial court also entered an Order for Mental Evaluation of Defendant that directed Central State Hospital to perform an evaluation on Petitioner to determine his competency to stand trial, degree of mental competence at the time of the crime, and whether Petitioner met the criterial for "mentally ill" or "mentally retarded." (Resp't Ex. 1, p. 177).

There was a statement or statements that were provided by [Petitioner] to the State which more of less put him in the middle of these things and we knew – I knew we were going to have a tough go of it on the guilt/innocence part of the case. So we went from there. . . .

I guess our strategy for the guilt/innocence part of the case was the best that we could realistically hope for was a felony murder conviction, hopefully the jury would – we were hoping they would have some . . . doubt at least about the level of culpability of [Petitioner] compared to Mark Braxley.

(Resp't Ex. 48, p. 143).

In relation to the penalty phase of the trial, counsel explained that their strategy was three-fold. They sought to (1) use residual doubt from the guilt-innocence phase to establish that "Braxley was the worst actor in the case, more culpable"; (2) to present "all the background evidence on [Petitioner]" to show that he had a tragic upbringing; and (3) to use the "psychiatric diagnosis" from Dr. Thomas Brown. (Resp't Ex. 48, p. 164-65).

The record from the trial shows that Petitioner's counsel pointed out the age difference between nineteen year old Bishop and thirty-five year old Braxley. (Resp't Ex. 18, p. 1700). Moreover, they sought to emphasize that although Petitioner beat Morrison, after a night in which they were all drinking heavily and using drugs, Petitioner left the room after taking Morrison's car keys and was out of the room when Braxley administered the fatal blow to Morrison. (Resp't Ex. 18, 1700-04, 1859-60, 1915-1927, 2149).

During the penalty phase of the trial, counsel asked the jury to "consider what is known in the law as residual or lingering doubt that you may have as to who actually took the life of Leverett Lewis Morrison." (Resp't Ex. 20, p. 2260). Counsel requested as follows:

I would again urge you that there remains some doubt as to whether it was [Petitioner's] blows that killed [Morrison] or whether it was Mark Braxley and we think . . . that's something that you can consider – you can consider this residual doubt about his actions here as in the matter of Ricky Lee [Wills] in deciding between these three punishments.

(Resp't Ex. 20, p. 2260).

In order to cast doubt that Petitioner was the one who murdered Wills, counsel sought to establish that Braxley, not Petitioner, fought and threatened another witness (Joel Jason Arnett) and Braxley, not Petitioner, bragged about having a body buried in his yard. (Resp't Ex. 20, p. 2326, 2592-93). Also, counsel called witnesses to establish that Braxley owned a knife that presumably was used to kill Ricky Lee Wills and that Braxley was the one who hid the knife in his tackle box on the night he murdered Wills. (Resp't Ex. 20, p. 2591-2606).

In order to show Petitioner's deprived background, counsel introduced three case workers from DFACS. These women explained that even before Petitioner was born, his mother, Carolyn Bishop Edinfield, did not have a stable place to live, was in an abusive relationship, and was drinking heavily. (Resp't Ex. 20, p. 2615-16). They established that after his birth, she would leave both Petitioner and his older half-brother, Michael Bishop, with a babysitter and not come back for days. When Petitioner was only five or six years old, DFACS had to take both children from her custody because she had simply abandoned them. (Resp't Ex. 20, p. 2617). Thereafter, on the occasions when their mother came to visit them in their various foster homes, she was frequently intoxicated. (Resp't Ex. 20, p. 2621; Resp't Ex. 21, p. 2658). Whenever they would return to their mother's custody,

drugs, alcohol and violence would become an every day reality for them.  (Resp't Ex. 20, p. 2619).  On numerous occasions when Petitioner visited or returned to the custody of his mother, he was physically abused and severely beaten by his mother's boyfriend, Tony Townsend.  (Resp't Ex. 20, p. 2624, Resp't Ex. 21, p. 2682-83).  The caseworkers testified that Petitioner once had to hide under a bed because there was a gunfight in the mobile home in which they were living and Tony Townsend was shot.  (Resp't Ex. 20, p. 2618).  Carolyn Bishop was later charged with attempted murder for the shooting.  (Resp't Ex. 21, p. 2855).

Jurors learned that Petitioner was placed in no less than sixteen (16) foster homes or institutions during his childhood.  (Resp't Ex. 21, p. 2657).  The case workers explained that he was a meek and passive child who deeply loved his mother.  (Resp't Ex. 21, p. 2657-58).  They testified that regardless of what happened to him or how his mother failed to care for and protect him, he "held on to the idea that his mother would change and he was going to be able to go back to live with her." (Resp't Ex. 21, p. 2681). They testified that he did get into trouble at several of the foster homes and institutions (Methodist Home for Children and Hepzibah Children's Home), not because he was an inherently bad child, but because he thought that if he caused enough trouble he would be sent back to live with his mother.  (Resp't Ex. 21, p. 2658, 2676, 2683).  Ida Hart Freeman, Petitioner's second DFACS caseworker, testified that while most children adjust to foster care and "try to stay there [,] . . . [Josh] was always trying to get home."  (Resp't Ex. 21, p. 2658).

Case workers also testified that when Petitioner was allowed weekend visits with

his mother, he began, at an early age, abusing alcohol and started sniffing gasoline to get high during these visists. (Resp't Ex. 21, p. 2690). Lucy Stewart, Petitioner's final DFACS caseworker, explained that the agency should have terminated Carolyn Bishop's parental rights, but they did not. (Resp't Ex. 21, p. 2691). When Petitioner ultimately went back to live with his mother in 1991, they had no home and were sleeping in cars, abandoned houses, and under bridges. (Resp't Ex. 21, p. 2694-95). Moreover, Ms. Stewart stated that Petitioner needed intensive individual therapy and counseling, but he never received such treatment due to a lack of funding. (Resp't Ex. 21, p. 2696, 2715).

Trial counsel also had three of Petitioner's foster parents and one employee of the Methodist Home for Children testify. They all testified that Petitioner was a normal, well-liked child who "was a victim of circumstances" and who eventually "got lost in the system." (Resp't Ex. 21, p. 2759, 2768, 2806). Jeffrey Lawrence, Assistant Administrator from the Methodist Home for Children, admitted that Petitioner's bad behavior did escalate during his stay in that facility, but this was because he was attempting to be returned to his mother. (Resp't Ex. 21, p. 2774-76). Moreover, he testified that Petitioner did not receive some additional psychological treatment that would have been beneficial because Medicaid would not pay for the therapy. (Resp't. Ex. 21, p. 2778).

Counsel had Dr. Thomas W. Brown, an expert in forensic psychiatry and alcohol and drug treatment, testify for Petitioner. (Resp't Ex. 21, p. 2718-51). Dr. Brown stated that Petitioner experienced "the most profoundly unstable home life [he had] run into in

[his] practice." (Resp't Ex. 21, p. 2721). He explained that Petitioner suffered from long term deprivation due to his unstable family life, an inheritable biochemical disorder called intermittent explosive disorder, and drug and alcohol abuse since the age of eleven or twelve. (Resp't Ex. 21, p. 2722-24, 2734). He explained that intermittent explosive disorder is easily treated with medication. (Resp't Ex. 31, p. 2743). Moreover, he testified that Petitioner would be able to adapt well to prison life without being a threat to the prison population. Dr. Brown explained that Petitioner would be less likely to exhibit symptoms of intermittent explosive disorder in prison because he would not have access to illegal drugs and alcohol, which exacerbate this biochemical disorder. (Resp't Ex. 21, p. 2733-34).

Counsel also had Petitioner's half-brother testify. Michael testified that they never knew who Joshua's biological father was and there was no father figure in either of their lives. (Resp't Ex. 21, p. 2810-12). He stated that their mother and her boyfriend, Tony Towson, drank alcohol and physically fought every day of their lives for almost fifteen years. (Resp't Ex. 21, p. 2813). He explained that drugs and alcohol were a constant when they lived with their mother and that he and Petitioner witnessed their mother receive black eyes, cuts, bruises, broken ribs, punctured lungs, get thrown from a moving car, and have her teeth knocked out. (Rep't Ex. 21, p. 2813-14, 2822). Michael testified that she would leave them with random babysitters for weeks at a time without explanation and he finally realized that "there is no changing her." (Resp't Ex. 21, p. 2815). In contrast, he explained that Petitioner deeply loved his mother and would never come to this realization. Instead,

Petitioner always sought to remain with their mother. (Resp't Ex. 21, p. 2815-16, 2827).

The final witness that counsel called during the penalty phase was Petitioner's mother. Mrs. Edinfield explained that she had been in jail ten to fifteen times during her life. (Resp't Ex. 21, p. 2843). Moreover, she did not know who Petitioner's biological father was because, although married at the time, she was "seeing . . . a lot of different men." (Resp't Ex. 21, p. 2845). She testified that she was addicted to alcohol, methamphetamine, and cocaine and that she consumed all of these when she was pregnant with Petitioner. (Resp't Ex. 21, p. 2849). She explained that later in the pregnancy, she decided to limit herself to only drinking alcohol and smoking marijuana. (Resp't Ex. 21, p. 2849). According to her, when Petitioner was three weeks old, she moved in with Tony Townsend and the physical violence between the two of them started immediately and was witnessed by Petitioner throughout the years. (Resp't Ex. 21, p. 2850-51). She testified that when Townsend was drunk he would physically abuse Petitioner and that she neglected both Petitioner and Michael. (Resp't Ex. 21, p. 2856). She explained that she gave Petitioner alcohol to drink when he was only four years old and that at a young age he also started smoking marijuana and taking pills. (Resp't Ex. 21, p. 2860). She stated that she "wasn't a mom" and made an impassioned plea for Petitioner's life. (Resp't Ex. 21, p. 2871-72). She begged the jury to spare his life and explained that during Petitioner's whole life, all she thought about was "getting drunk, doing drugs, going out and enjoying [herself]." (Resp't Ex. 21, p. 2872). She asked the jury not to "punish him for the things [she] did." (Resp't Ex. 21, p. 2872).

By all accounts, the testimony during the penalty phase was very emotional and

many of the jurors, attorneys, and spectators were in tears. (Pet'r Nov. 6, 2009 Br., p. 7; Resp't Ex. 48, p. 102).

It is with this background in mind and with the principles announced in *Strickland,* that the Court considers each of Petitioner's three ineffective assistance of counsel challenges:

1. Petitioner's claim that trial counsel was ineffective in their investigation and presentation of Braxley's criminal history, history of violence, and dominance over Petitioner

Petitioner concedes that the jury knew Petitioner was many years younger than Braxley and that the murders occurred at Braxley's trailer. However, Petitioner claims his counsel were ineffective for failing to investigate and provide the jury "information about Mr. Braxley's history as a drug dealer and addict [and] . . . his history of extreme violence and controlling behavior, particularly in his relationship to [Petitioner]." (Pet'r Nov. 6, 2009 Br., p. 19).

The state habeas court found as follows:

The evidence is undisputable that defense counsel investigated Braxley's criminal background history and learned that evidence existed of his "bad character." . . .

Mr. Combs and Mr. Bellury were also familiar with the law concerning the introduction of character evidence, evidence of a victim's bad character, other bad acts of a co-defendant and similar transaction evidence. Since the law provides that only evidence regarding "the motive of the defendant, his lack of remorse, his general moral character and his predisposition to commit other crimes is admissible" in the sentencing phase, the Court finds that trial counsel were not deficient for declining to attempt to present evidence concerning Braxley's character and criminal history. Accordingly, the Court denies this claim of ineffective assistance of counsel. Even if such evidence was admissible in theory as mitigation evidence, the

Court nevertheless finds counsel's actions to be reasonable and effective in deciding not to introduce such evidence. Further Bishop has failed to show any prejudice he suffered as a result of trial counsel's decisions concerning Braxley; through the evidence presented during the trial, the jury did learn that Braxley used illegal drugs, abused alcohol, engaged in violent acts, and acted deceptively, and Bishop has failed to show that any additional evidence of Braxley's bad character and/or criminal history would likely have changed the outcome of his trial.

Bishop also points to alleged "similar transaction" evidence (via affidavit testimony) that he contends should have been introduced at his trial. Specifically, Bishop point to Kim Cook's allegation that Braxley beat her up while she was sleeping, and Sandra Jones' allegation that Braxley threatened to cut her throat if she ever "fought back." This evidence would likely not be admissible as similar transaction evidence offered in an attempt to show that Braxley directly participated in Morrison's and [Wills'] murders, since Bishop has failed to establish that there was a "sufficient connection or similarity between" these alleged acts and the Morrison and [Wills] murders such that proof of the former tends to prove Braxley's participation in the later. Additionally, the evidence in the case shows that trial counsel consulted with death penalty defense attorney Palmer Singleton and his staff regarding this issue and their researched reflected that there was no Georgia case law to support the admission of such evidence; therefore, counsel decided not to attempt to introduce this evidence, and the Court finds that counsel's decision was reasonable and effective. Even if this alleged similar transaction evidence was admissible, since Bishop admitted to having motives to attack Morrison and [Wills], to administering the first crushing blows to Morrison after which he appeared to stop breathing, and to administering initial and repeated blows to [Wills], there is not a reasonable probability that this evidence would have changed the outcome of this case in light of all of the other evidence presented.

(Resp't Ex. 95, p. 116-17)(footnotes and emphasis omitted).

Petitioner argues that such evidence is admissible and the "state habeas court's unreasonable characterization of Georgia law led to an unreasonable application and/or contravention of *Strickland*." (Pet'r Feb. 1, 2010 Br., p. 33). The record is clear, however, that counsel explored the issue of "using uncharged misconduct evidence of a codefendant." (Resp't Ex. 75, p. 6301). However, they could not find a case to support

the introduction of such evidence.  (Resp't Ex. 75, p. 6301).

Petitioner points to a Georgia Supreme Court case decided in 2001–five years after Petitioner's trial and after the time in which Petitioner's counsel would be researching the issue–for the proposition that Braxley's bad character evidence was admissible.  ***See Head v. Carr***, 273 Ga. 613, (2001).  However, in ***Carr***, the Court merely held that trial counsel was not ineffective for failing to call three additional witnesses to testify about a co-defendant's history of violence and dominating behavior because such had already been established.  ***Id***. at 628-29.  The same can be said in the present case.  As the Georgia Supreme Court found, evidence of Braxley's bad character was well-established.  It was shown that Braxley regularly abused alcohol and illegal drugs, got into bar fights, bragged about killing people, willingly participated in both Morrison and Wills' murder, disposed of their bodies, and purportedly had possession of and hid the knife that he allegedly was used to cut Wills' throat.  (Resp't Ex. 18, p. 1853, 1915, 1925, Resp't Ex. 20, p. 2326, 2519-28).

The Georgia Supreme Court also found that, even if additional evidence of Braxley's bad character was admissible as mitigation evidence, Petitioner failed to show prejudice.  Petitioner claims that this determination impermissibly "sidestep[s] the issue of deficient performance."  (Pet'r Feb. 1, 2010 Br., p. 31).  However, there is no requirement that a court even consider performance if a petitioner fails to show prejudice.  ***Randolph v. McNeil***, 590 F.3d 1273, 1276 (11th Cir. 2009)(explaining that "'there is no reason for a court deciding an ineffective assistance claim to . . . address both components

of the inquiry if the defendant makes an insufficient showing on one'")(quoting *Strickland*, 466 U.S. at 697).

Additionally, the state court's determination that Petitioner failed to show prejudice did not involve an unreasonable application of *Strickland*, nor was it based on any unreasonable findings of facts. As explained above, there was evidence of Braxley's bad character presented at trial and "since Bishop admitted to having motives to attack Morrison and Wills, to administering the first crushing blows to Morrison . . . , and to administering initial repeated blows to Wills, there is not a reasonable probability that [additional evidence of Braxley's bad character] . . . would have changed the outcome of this case in light of all of the other evidence presented." (Resp't Ex. 95, p. 118).

2. Petitioner's claim that trial counsel was ineffective for failing to introduce lead investigating officers' testimony about Petitioner's truthfulness, remorse, and their opinions that he deserved a life sentence

Petitioner maintains as follows:

> [The] jury was deprived of the powerful testimony of the lead law enforcement officers who investigated his case (Sheriff Bill Massee, Chief Deputy Howard Sills, and Chief Detective Ricky Horn) that [Petitioner] was remorseful for his participation in the crimes, that Mr. Braxley was not remorseful, that they believed [Petitioner's] account of the crimes was credible, that Mr. Braxley was the more culpable party, that [Petitioner] had shown good behavior in jail pending trial, and that the investigators were not opposed to a plea to life without parole for [Petitioner].

(Pet'r Nov. 6, 2009 Br., p. 57).

The state habeas court found as follows regarding this particular claim:

> The Court finds that Bishop has failed to present evidence sufficient to overcome the presumption that trial counsel acted reasonably and effectively in declining to present the testimony of Detective Horn, Deputy

20

Sills and Sheriff Massee concerning their opinions about Bishop's apparent remorse, relative culpability, Braxley's culpability and Bishop's sentence. Further Bishop has failed to show how he suffered prejudice as a result of counsel's decisions, that if this opinion testimony from these law enforcement officers had been presented to the jury, there is a reasonable likelihood that the outcome of this trial would have been different.

(Resp't Ex. 95, p. 124) (footnotes omitted).

The record supports these finding. At the state habeas hearing, counsel testified that while investigators were willing to speak "off the record" or "one-on-one," they expressed reluctance or concern about repeating their sentiments on the witness stand. (Resp't Ex. 48, p. 215). Counsel explained that their purpose in speaking to law enforcement officers about Petitioner's candor and remorse was "to try and get them to talk to [the District Attorney] about a plea." (Resp't Ex. 48, p. 216). While the officers were willing to assist in this regard, they informed counsel they were not going to assist them during trial. (Resp't Ex. 48, p. 214-16). Counsel explained that he worried "it would backfire on [them]" if law enforcement officers were questioned regarding Petitioner's remorse and truthfulness and the officers were not "willing to back it up." (Resp't Ex. 48, p. 215).

Petitioner maintains that the state habeas court found that counsel "had no valid reason not to introduce" the officers' testimony and "counsel simply neglected to present this testimony." (Pet'r Nov. 6, 2009 Br., p. 58, 63). This is not the case. Instead, the state habeas court found that the District Attorney[6] had not pressured or threatened the officers

---

[6]At the state habeas level, Petitioner presented a separate prosecutorial misconduct claim regarding potential testimony from these law enforcement officers. Petitioner argued that "due to improper influence by the State, the jury was not made aware that three law enforcement officers involved in the investigation of the case . . . believed [Petitioner] was telling the truth about his involvement in the crimes and believed that a life sentence would be appropriate." (Resp't Ex. 95, p. 47). The state habeas court found that "Detective Horn, Deputy Sills and Sheriff Massee indicated to defense counsel that their opinions were 'off the record,' to be used

to prevent them from testifying. The court did not find it unreasonable that trial counsel

relied upon the officers' own statements that they did not want to testify to help Petitioner.

The officers' representations that they would not testify at trial to help Petitioner are no less

true simply because they were not coerced by the State or the District Attorney to reach

their decisions. Moreover, given the fact that the officers told counsel, "hell, no, I'm not

going to help you on that," it was reasonable for counsel to refrain from this line of

questioning with the officers. (Resp't Ex. 48, p. 216).[7]

Finally, petitioner claims that the state habeas court's "summary denial of prejudice

is unreasonable" and that the court failed "to consider the totality of the evidence" when

it determined a lack of prejudice. The Eleventh Circuit Court of Appeals has "repeatedly

held [that] 'a state court's summary rejection of a claim qualifies as an adjudication on the

merits under § 2254(d) so as to warrant deference'." ***Blankenship v. Hall***, 542 F.3d 1253,

1271 (11th Cir. 2008), ***petition for cert. filed*** (U.S. Apr. 20, 2009)(No. 08-9917)(quoting

***Ferguson v. Culliver***, 527 F.3d 1144, 1146 (11th Cir. 2006)). Moreover, it is clear that the

---

in plea negotiations with the District Attorney and that they would not voice such opinions on the witness stand at trial." (Resp't Ex. 95, p. 47). The Court found, however, that "there [was] absolutely no evidence of any pressure or threats made by the District Attorney or any other member of the prosecution team against these law enforcement officers causing the officers to feel compelled to present false testimony in response to any questions by defense counsel." (Resp't Ex. 95, p. 48).

[7]Respondent maintains that "also supporting the state court's finding that trial counsel did not act unreasonable in not attempting to present this testimony from these law enforcement officers is the fact that Petitioner failed to prove that the testimony would have been admissible during Petitioner's criminal trial." (Resp't Dec. 31, 2009 Br., p. 18). Petitioner vigorously disagrees. However, the state habeas court did not base its decision on the admissibility of this evidence. Instead, it found that counsel were reasonable when they failed to question these officers because the officers had already informed counsel they would not be helpful. This Court finds this ruling is not based on any unreasonable determinations of fact and does not involve an unreasonable application of ***Strickland***. Therefore, this Court need not address the separate issue of whether the officers' opinions would have been admissible.

state habeas court did, in its 142 page Order, consider the totality of the evidence, both that adduced at trial and that at the state habeas evidentiary hearing, when determining a lack of prejudice.

   3. Petitioner's claim that trial counsel were ineffective for failing to investigate and present blood evidence supporting their theory that Braxley directly participated in the crime

   Petitioner claims that trial counsel were ineffective because they failed to request funds and consult with a blood splatter expert to refute "Braxley's denial of any involvement in the attack on Morrison." (Pet'r Nov. 6, 2009 Br., p. 80). The state habeas court addressed this claim in detail. It explained as follows:

> Trial counsel's unrefuted testimony is that they carefully evaluated the need for experts in different areas of the case and carefully chose which experts to spend Bishop's limited State-provided resources on: "[W]e had to make choices about where to spend the limited funding that we were provided in this case, and securing [a blood splatter] expert was way down on the list in light of the need for an investigator and other expert assistance." Instead, counsel reasonably chose to use the funds to hire an investigator, a psychiatrist and a psychologist to assist in preparing the mitigation case given what counsel perceived to be strong evidence of Bishop's guilt of Morrison's murder and the likelihood of a murder conviction.

> Further, Bishop has failed to show prejudice. . . . Bishop argues that these experts could have located and presented evidence that would show that Braxley participated in the beating and killing of Morrison; however, the lack of such expert evidence is not prejudicial in light of the fact that the State did not dispute Bishop's assertion that Braxley participated in the murder, and in fact, presented Bishop's statements to the jury wherein he tells law enforcement about Braxley's participation in the murder. . . .

> With respect to Bishop's specific claim that a blood splatter expert should have been hired . . . Bishop has failed to establish prejudice; there is no reasonable probability that the testimony of a blood splatter expert (such as Marilyn Miller, the expert Bishop hired in this case) would have changed the outcome of Bishop's trial, since the testimony presented by Ms. Miller . . . , while purporting to inculpate Braxley, "fails to cast doubt on [Bishop's]

guilt" for the murder of Morrison. . . . Ms. Miller's conclusions are refuted by the evidence as shown by Jerry Findley, the State's expert in blood stain pattern analysis . . . . Mr. Findley testified that he "didn't see anything on" Braxley's clothing that "would tell me that" Braxley participated in beating Morrison.

(Resp't Ex. 95, p. 97-100)(citations and footnotes omitted).

In conducting its ***Strickland*** analysis, the state habeas court then reviewed each of Braxley's clothing items–jeans, underwear, and work boots. The court considered the testimony surrounding each–both that given by Petitioner in Marilyn Miller's affidavit and offered by Respondent in Jerry Findley's testimony at the state habeas evidentiary hearing. The court found that Ms. Miller's conclusions regarding each of these items were not supported by the evidence and were successfully refuted by Mr. Findley.[8] (Resp't Ex. 95, p. 100-103).

The record supports the habeas court's factual findings and determinations. First, the record shows that counsel were given a limited about of money to spend on experts. They testified that they "were limited as to the funds that the judge would allow [them] to have for experts . . . so the decision had to be made as to what was the priority." (Resp't Ex. 48, p. 123, 188-91). After consideration, counsel determined to use funds to hire an investigator, a psychologist, a psychiatrist, and a jury consultant. Counsel explained that

---

[8]Petitioner maintains, without citation to the record, that "the state habeas court's findings ignore the fact that on every point of contention between the experts, Mr. Findley, ultimately conceded that Ms. Miller's conclusions about the provenance of the blood splatter was more likely. In this sense, the habeas court's decision is based on an unreasonable determination of fact." (Pet'r Nov. 6, 2010 Br., p. 82-83). A review of the record shows this is not the case. Following cross examination, Mr. Findley explained that he did not change his conclusions regarding the blood evidence based on any items presented during the examination and he still did not agree with some of Ms. Miller's scientific conclusions. (Resp't Ex. 49, p. 411).

they did file additional motions for funds, but had to "pick [their] battle" because they knew they "weren't going to be able to get any more" money. (Resp't Ex 48, p. 189). In fact, counsel testified that they did not have enough funds to pay for the experts that they did hire and they ended up spending at least $6,000.00 of their own money for experts to assist in litigation. (Resp't Ex. 48, p. 124, 177, 188). Counsel also testified that, due to Petitioner's statements about his role in the murder of Morrison, they knew they "were going to have a tough go of it on the guilt/innocence part of the case" and focused on mitigation or the penalty phase of the trial. (Resp't Ex. 48, p. 143). Therefore, as the state habeas court found, it was reasonable for counsel to use limited funds they had to hire experts who assisted them in the penalty phase of the case. *See **Putman v. Head***, 268 F.3d 1223 (11th Cir. 2001)(explaining that counsel almost always can do more, but the Constitution requires only that counsel act reasonably).

Petitioner maintains that he has shown prejudice because "a credible argument could have been made, using the assistance of a blood splatter expert, that Braxley was lying about his lack of involvement." (Pet'r Nov. 6, 2009 Br., p. 83). A review of the trial record shows that everyone, including the State, admitted Braxley was involved in Mr. Morrison's murder. The State introduced Petitioner's statement in which he stated that Braxley was directly involved in beating Morrison to death and in dumping his body. (Resp't Ex. 19, p. 1915-27). In its closing statement, the State didn't deny that Braxley was involved in beating Morrison to death and dumping his body. The District Attorney explained to the jury that if Petitioner, as he maintained in his own statement, only hit

Morrison two times and "Braxley finished him off with the other three times . . . [Petitioner] is still guilty of murder." (Resp't Ex. 19, p. 2124). Therefore, this Court agrees with the state habeas court that "the lack of . . . expert evidence [that Braxley participated in Morrison's murder] is not prejudicial in light of the fact that the State did not dispute Bishop's assertion that Braxley participated in the murder." (Resp't Ex. 95, p. 98).

In conclusion, the Court finds that the state habeas court properly applied *Strickland* and correctly determined that Petitioner failed to establish either required component of any of his ineffective assistance of counsel claims. Because the state court's decision was not based on any unreasonable determinations of fact or an unreasonable application of *Strickland*, this Court must deny relief on Petitioner's ineffective assistance of counsel claims.

### C. Claim Nine: A death sentence in this case is disproportionate punishment, and such arbitrary application of the death penalty violates the Eighth and Fourteenth Amendments to the United States Constitution.

Petitioner maintains that his death sentence was arbitrarily and capriciously imposed and affirmed in contravention of *Furman v. Georgia*, 408 U.S. 238 (1972), and related precedent. However, a review of the direct appeal in this case shows that the Georgia Supreme Court examined the issue of the proportionality of Petitioner's death sentence, as required by O.C.G.A. § 17-10-35. That Court held as follows:

> Bishop's death sentence was not imposed under the influence of passion, prejudice or other arbitrary factor. The death sentence is neither

excessive nor disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. Bishop's argument that his sentence is disproportionate to the life sentence received by Braxley is without merit. Nor do we find that the death sentence is rendered inappropriate by virtue of Bishop's history of alleged abuse. The similar cases listed in the Appendix support the imposition of the death sentence in this case.

**Bishop**, 268 Ga. at 296 (citations and footnotes omitted).

Petitioner first complains that the Georgia Supreme Court did not consider similarly situated individuals who had not been put to death when conducting its proportionality review. Instead, when reviewing the proportionality of Petitioner's death sentence, the court considered only cases in which the defendants were sentenced to death. Petitioner claims that due to this, the proportionality review was contrary to and/or an unreasonable application of **Furman** and its progeny.

However, neither **Furman**, nor any related cases have held that the Georgia courts must conduct a proportionality review that includes life sentences. In fact, the United States Supreme Court has held that no proportionality review in any form is required and it would be error to conclude "that **Gregg** required proportionality review." **Pulley v. Harris**, 465 U.S. 37, 46 (1984). In **Pulley**, the United State Supreme Court explained that it has "emphasiz[ed] the importance of mandatory appellate review under the Georgia statute, [but has not held] that without comparative proportionality review the statute would be unconstitutional." **Id**. at 50 (**citing Zant v. Stephens**, 462 U.S. 862 (1983)). The Court explained that "[p]roportionality review [is] considered to be an additional safeguard

against arbitrarily imposed death sentences, but we [do] not hold that comparative review [is] constitutionally required." *Id*; *See also McClesky v. Kemp*, 481 U.S. 279, 306-307 (1987)(holding that "absent a showing that the Georgia capital punishment system operates in an arbitrary and capricious manner, [the petitioner] cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty").

To support his proposition that a proportionality review must include both death cases and cases in which life sentences were given, Petitioner cites *Walker v. Georgia*, 129 S. Ct. 453 (2008)(Stevens, J., statement respecting denial of certiorari). In *Walker*, Justice Stevens explained that the Court denied certiorari because the petitioner did not litigate the relevant issue in the state courts and emphasized that "the Court's denial has no precedential value." *Id*. at 454. He observed that the Georgia Supreme Court no longer "include[s] in its [proportionality] review cases that [do] not result in a death sentence." *Id*. at 456. Justice Stevens expressed concern that "the likely result of such a truncated review . . . is the arbitrary or discriminatory imposition of death sentences." *Id*. at 457.

Conversely, in his statement concurring in the denial of the petition for certiorari, Justice Thomas disagreed with Justice Stevens and stated that "[p]roportionality review is not constitutionally required in any form. Georgia simply has elected, as a matter of state law, to provide an additional protection for capital defendants." *Id*. at 348-49 (Thomas, J., statement respecting denial of certiorari).

The sole question for this Court in this habeas action is whether the Georgia Supreme Court's decision on this issue was "contrary to, or an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254. "'[C]learly established Federal law' consists of the 'holdings . . ., of the [United States Supreme] Court's decisions as of the time of the relevant state-court decision'." *Newland v. Hall*, 527 F.3d 1162, 1183 (11th Cir. 2008) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). Certainly "clearly established Federal law," does not consist of statements made by individual Justices many years after the relevant state court decision. 28 U.S.C. § 2254(d).

Petitioner also claims that the Georgia Supreme Court provided only a "cursory analysis" when determining that the death penalty imposed on him was not disproportionate to the sentence given his co-defendant. Petitioner complains that "[t]he Court dismissed this claim in a single sentence." (Pet'r Nov. 6, 2009 Br., p. 100-101). Even if the Court had summarily denied Petitioner's sentencing claim, the decision would still be entitled to deference. *Parker v. Sec'y for the Dep't of Corr.*, 331 F.3d 764, 776 (11th Cir. 2003)(explaining that "'the summary nature of the state court's decision does not lessen the deference that is due'.")(quoting *Wright v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1254 (11th Cir. 2002)). However, the Georgia Supreme Court also made specific findings of fact that the District Attorney's characterization of Petitioner as the "'main one'" or "'prime mover'" was supported by the evidence. *Bishop*, 268 at 293. The Court found that Petitioner, not his co-defendant, "admitted it was he who attempted to steal Morrison's car keys and who instigated the beating by administering the first crushing

blows, after which Morrison stopped breathing." *Id.* at 294. Moreover, the Court found

that Petitioner admitted to "stealing Morrison's keys after the beating and suggesting to

Braxley that they dispose of the body." *Id*. Finally, the Georgia Supreme Court found that

"the signed hair on his hands indicated that Bishop set fire to Morrison's car to destroy

evidence of the crimes." *Id*. Petitioner has not shown these findings of fact were

unreasonable.

In short, Petitioner has not shown that the state court's proportionality review was

contrary to, or involved an unreasonable application of, Supreme Court precedent. Further,

Petitioner has not shown that the Georgia Supreme Court's determination on this issue was

based on any unreasonable determinations of facts. Therefore, the Court denies this claim.

**D. Claim Two: Misconduct by the prosecution team and other state agents deprived Petitioner of his constitutional rights to due process and a fair trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Petitioner maintains that "[t]he State . . . allowed its witnesses to convey a false

impression to the jury . . . leading the jury to believe that [Petitioner's] co-defendant, Mark

Braxley, would go to trial for the murder, when in fact he had already been offered a plea

to a parolable life sentence." (R. at 1, p. 28-29). The Court has already found this claim

to be procedurally defaulted. (R. at 34, p. 5-8). Petitioner asks the Court to reconsider this

decisions and maintains that he "did not fully brief this issue to this Court prior to its

decision." (Pet'r Nov. 6, 2009 Br., p. 105).

As the Court pointed out in its July 24, 2009 Order addressing procedural default,

Petitioner was the party who requested "a modified briefing schedule that provides for timely briefing of procedural default issues prior to merits briefing." (R. at 27). Moreover, Petitioner was given two opportunities to fully address this issue in his original brief dealing with procedural default and in his reply brief. (R. at 29, 32) However, due to the importance of these issues, the Court will consider the additional arguments contained in Petitioner's current brief.

Petitioner agrees that the state court found his claim to be procedurally defaulted, but claims the State's suppression of the plea offer to Braxley constitutes cause to overcome the default. The state habeas court specifically found that there was no suppression of such an offer because such an offer did not even exist. The Court held that "after carefully reviewing the record for this case, the Court finds that Bishop has failed to prove that the Baldwin County District Attorney offered a negotiated plea to Braxley (either directly or via communication with Braxley's counsel) before the conclusion of Bishop's trial." (Resp't. Ex. 95, p. 45).

Petitioner claims this finding of fact was unreasonable because the "the state habeas court . . . ignore[d] the extensive record that such a plea offer was made and instead rel[ied] solely on the District Attorney's vague and speculative reasoning that he must not have made the offer until after Bishop's trial." (Pet'r Nov. 6, 2009 Br, p. 112-13). However, a review of the record shows that the District Attorney, Fred Bright, did not offer a "vague and speculative" answer to the question of whether he negotiated a plea with Braxley prior to the conclusion of Petitioner's trial. Instead, he unequivocally stated that he made the

offer to Braxley after Petitioner's case was over. He explained that he "would not have made it prior to or during the Bishop case . . . [because] [he] would want to keep that option open." (Resp't Ex. 49, p. 415).

Petitioner maintains the state habeas court unreasonably ignored Braxley's trial attorney, Andrew Prince's, sworn affidavit. When Mr. Prince signed this affidavit and testified at the state habeas corpus evidentiary hearing, it had been approximately six years since his representation of Mr. Braxley. Mr. Prince explained that he had no idea where his file for Braxley was and he had no notes from the file with which to refresh his recollection before testifying at the evidentiary hearing or before signing his affidavit. (Resp't Ex. 48, p. 258-59). In his affidavit, he does not indicate exactly when the District Attorney offered Braxley a sentence of life with possibility of parole, he just states it was "[p]rior to the Bishop trial." (Resp't Ex. 48, p. 257, Resp't Ex. 50, p. 655-56). Following his representation of Braxley, Mr. Prince was convicted of theft by taking, imprisoned, and disbarred. *See Matter of B. Prince*, 268 Ga. 880 (1998). Given all of this, it was not unreasonable for the state habeas court to discount Mr. Prince's testimony.

Petitioner also maintains that the state habeas court ignored an affidavit of Cathy Crawford, a paralegal who did work for Mr. Prince. Ms. Crawford, however, consulted with Mr. Prince about when the plea deal was offered to Braxley prior to submitting her own affidavit testimony. (Resp't Ex. 48, p. 256). Moreover, the information contained in her affidavit, as well as that of Jeff Ertel (former Executive Director of the Georgia Resource Center and staff attorney at the Federal Defender Program) and Pam Leonard

(chief mitigation specialist with the Multi-County Public Defender Office), is negated by a memorandum that Pam Leonard authored on February 13, 1996.

In her affidavit, Ms. Crawford states that "[s]ometime after [the District Attorney] called with the offer" of a life sentence for Braxley, she met with Mr. Prince, Jeff Ertel, and Pam Leonard. Ms. Crawford stated that the meeting occurred right after Bishop received a death sentence and their conversation was "centered on the plea offer." (Resp't Ex. 50, p. 658). However, in the memoranda that Pam Leonard drafted immediately following the February 13, 1996 meeting, she made no mention of a plea offer. Instead, she explained that "very little has happened" in Braxley's case and that he has remained in jail "for a year and nine months." (Res't Ex. 103). She also stated that Bishop has been "recently convicted and sentenced to death" and "Prince thinks the DA may withdraw the death penalty since he got the Bishop conviction." (Resp't Ex. 103). Certainly if Mr. Prince was simply thinking that the District Attorney "might withdraw the death penalty," the District Attorney had not already agreed to do so.

Given these facts, this Court cannot say the state habeas court was unreasonable when it decided that the District Attorney had not offered Braxley a plea to a parolable life sentence prior to Petitioner's trial. Moreover, "28 U.S.C. § 2254(d) gives federal habeas corpus courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state . . . court, but not by them." *Marshall v. Lonberger*, 459 US 422 (1983). Therefore, this Court defers to the state habeas court's determination that the District Attorney's testimony was credible; while the testimony and affidavit of Petitioner's

witnesses were not. *See Baldwin v. Johnson*, 152 F.3d 1304, 1317 (11th Cir. 1998); *Smith v. Kemp*, 715 F.2d 1459, 1465 (11th Cir. 1983)(explaining that "[r]esolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing").

The Court reaffirms its July 27, 2009 ruling that Claim Two is procedurally defaulted and that Petitioner has not shown cause and prejudice to the overcome the default. Moreover, Petitioner has not shown that failure to review any defaulted claims, including Claim Two, would result in a fundamental miscarriage of justice.

## III. CONCLUSION

Based on the above, the Court **DENIES** Petitioner's Petition for Writ of Habeas Corpus By a Person in State Custody.

**SO ORDERED**, this 4th day of May, 2010.


                                        *s/  Hugh Lawson*
                                        HUGH LAWSON
                                        UNITED STATES DISTRICT JUDGE


lnb